UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHARDENAY PALMER,<br>Plaintiff,<br>-against-<br><br>CAPITAL ONE N.A., a subsidiary of CAPITAL ONE FINANCIAL CORPORATION,<br>Defendant. | Case No. 25-cv-1320-GRB-AYS<br><br>**DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Defendant Capital One N.A., a subsidiary of Capital One Financial Corporation, by and through its counsel, Morgan, Lewis & Bockius LLP, hereby respectfully submits this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1.

**Capital One**

1. Defendant Capital One N.A. ("Capital One" or the "Company") is a wholly-owned subsidiary of Capital One Financial Corporation. Capital One offers a broad spectrum of banking products and financial services to consumers, small businesses, and commercial clients. *See* Capital One Financial Corporation 2025 Form 10-K at 130.[1]

2. Capital One has policies reflecting the Company's commitment to equal employment opportunity. For example, Capital One's Code of Conduct states that the Company is "committed to maintaining a work environment that is free from all forms of unlawful discrimination and harassment" and "does not tolerate harassment or discrimination in any form,"

[1] Copies of Capital One Financial Corporation's Form 10-Ks for relevant years are publicly available at https://ir-capitalone.gcs-web.com/financial-results/sec-filings.

including on the basis of pregnancy, maternity status, or any other status protected by applicable law. The Code of Conduct likewise emphasizes "Do the Right Thing" as one of its core values. It explains that "Capital One is committed to maintaining a healthy and safe workplace for our associates, customers, and visitors. All associates are responsible for complying with applicable health, safety, security, and environmental laws and Company policy." *See* Ex. 1[2] at PALMER-00000035, 37, 44, 45.

3. Plaintiff was aware of Capital One's Code of Conduct and non-discrimination policies and knew they were in place throughout her employment with the Company. *See* Deposition Transcript of Shardenay Palmer ("Plaintiff Tr.") at 200:12-23, a true and correct copy of which is attached hereto as Exhibit B. Throughout Plaintiff's employment, Capital One also had policies of which Plaintiff was aware that set forth avenues through which employees could raise complaints of discrimination and other violations of Company policies. Plaintiff Tr. 200:24-201:5; Ex. 1 at PALMER-00000039-40.

**Plaintiff's Background, Employment, and Performance with Capital One**

4. Plaintiff began working with Capital One as an Assistant Branch Manager on March 16, 2015. Plaintiff Tr. 25:4-26:2. Between 2015 and December 2021, Plaintiff held various other roles at Capital One, including Branch Manager (Plaintiff Tr. 27:4-12), Senior Risk Associate (*id.* at 29:1-31:18), and Regional Operations Manager ("ROM") (*id.* at 32:22-33:19).

5. Effective December 26, 2021, Ms. Conte promoted Plaintiff to Market Executive ("ME") for the Suffolk County market. Ex. 2; Plaintiff Tr. 41:10-42:14. In January 2024, Plaintiff

[2] Attached hereto as Exhibit A is the Declaration of Gina F. McGuire in Support of Defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment (the "McGuire Declaration" or "McGuire Decl."). All exhibits referenced herein are attached to the McGuire Declaration except as otherwise noted. For ease of reference all references to numbered Exhibits (e.g., "Ex. 1," "Ex. 2") are to those attached to the McGuire Declaration, and references to lettered Exhibits (e.g., "Ex. A," "Ex. B") are to those attached directly to this Statement of Undisputed Material Facts.

became ME for the Nassau County market. Plaintiff Tr. 47:21-25; Conte Decl.[3] ¶ 3. Kimberly Conte, Regional Executive, made the decision to promote Plaintiff, and Ms. Conte supervised Plaintiff in her role as an ME. Plaintiff Tr. 42:8-14, 48:5-7; Conte Decl. ¶ 4. Plaintiff did not notice or take Ms. Conte's deposition in this matter. Conte Decl. ¶ 22.

6. When Plaintiff became ME for the Suffolk market, she had approximately 16 branches under her purview, each with a branch manager (known as a "Market Manager" or "MM") who reported to her. Plaintiff Tr. 43:13-21; Conte Decl. ¶ 15. As an ME, Plaintiff had the responsibility to lead, develop, and strategize with the MMs reporting to her and ensure that all of the branches in her market were consistently meeting expectations around customer experience and operations on a day-to-day basis. Plaintiff Tr. 43:13-23, 47:6-17; Ex. 3. As an ME, Plaintiff was also expected to "own decisions across all initiatives," "[d]emonstrate integrated strategic and tactical thinking to make the right tradeoffs that balance the team and broader organizational perspective," operate in "gray space," and take "[o]wnership for service levels, risk and compliance, and regulatory policies and procedures." Ex. 3; Plaintiff Tr. 43:24-47:5.

7. Plaintiff testified that, in her role as ME, it was within her purview and part of her job to make decisions regarding the branches in her territory, including regarding ambassador and customer safety. Plaintiff Tr. 124:4-15.

8. The Company's performance evaluation system applicable to Plaintiff had five possible ratings for employee performance, proceeding from the highest rating to the lowest rating as follows: (1) Exceptional; (2) Very Strong; (3) Strong; (4) Inconsistent; and (5) Action Required. Plaintiff Tr. 55:3-17; 76:13-23.

---

[3] The "Conte Decl." refers to the Declaration of Kimberly Conte in Support of Defendant's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment, a true and correct copy of which is attached hereto as Exhibit C.

9. Ms. Conte prepared Plaintiff's performance review for 2022, Plaintiff's first year as an ME. Conte Decl. ¶ 6. In Plaintiff's 2022 Year-End Performance Review, Ms. Conte rated Plaintiff "Strong" overall but provided constructive criticism detailing the ways in which Plaintiff's performance needed to improve. Conte Decl. ¶ 6; Exs. 4 and 5. That feedback focused on the disconnect between Plaintiff and the employees she managed resulting from the manner in which Plaintiff engaged and interacted with them. Conte Decl. ¶ 6; Ex. 5. Plaintiff was aware of the criticism and feedback contained in her 2022 year-end written evaluation, including feedback from her direct reports reflected therein. Plaintiff Tr. 60:10-67:8.

10. Ms. Conte's 2022 Year-End Performance Review of Plaintiff also offered support and recommendations for how she might address and improve upon these issues going forward. Conte Decl. ¶ 6; Ex. 5. Indeed, Ms. Conte concluded the review by expressing that Plaintiff:

> has the skill and the will to be an extraordinary Market Executive. I look forward to seeing her take the feedback she has been given and put into practice and know that 2023 will be a great year for [Plaintiff].

Ex. 5.

11. Plaintiff's performance issues with respect to people leadership and management continued into 2023 and were reflected in her Mid-Year Performance Review and associated written evaluation prepared by Ms. Conte. Conte Decl. ¶ 7. Based on Plaintiff's ongoing performance issues, Ms. Conte was inclined to give Plaintiff a "Below Strong" rating, which she believed was more appropriate. *Id.*

12. Nevertheless, Ms. Conte believed and hoped that Plaintiff's performance would improve with continued coaching and, as such, she rated Plaintiff's overall performance "Strong" for the first half of 2023. Conte Decl. ¶ 7; Ex. 6. Regardless, Ms. Conte's written feedback on Plaintiff's ongoing performance issues noted that Plaintiff's "ability to influence her team through coaching inspiration and empowerment and inclusion [was] lagging behind those of her peers."

Conte Decl. ¶ 7; Ex. 7.

13. Ms. Conte noted that Plaintiff's "first and foremost" opportunity for improvement was "in the connections between her and the team." Conte Decl. ¶ 7; Ex. 7. She referred to Plaintiff's scores from the Company's All Associate Survey ("AAS") from January 2023 to May 2023, noting that they "show[ed] a significant drop in the engagement score of the Market Managers" reporting to Plaintiff from 100% to 71% and low scores of 36% and 18% for Plaintiff in the leadership support and people leadership indices. Conte Decl. ¶ 7; Ex. 7. Ms. Conte stated that Plaintiff needed "to use these data points to assess and reevaluate her leadership[.]" Ex. 7. She also explained that "[w]ell managed performance is a growing risk in the market and it needs improvement immediately." *Id.* Plaintiff was aware of the criticism and feedback contained in her 2023 midyear written evaluation, including the feedback from her direct reports reflected therein. Plaintiff Tr. 67:9-76:12; Ex. 8.

14. Ms. Conte's written evaluation once again provided support and recommendations on how Plaintiff could use the feedback to improve her performance. Conte Decl. ¶ 7; Ex. 7. Ms. Conte concluded the review by stating that Plaintiff had "the tools to right this ship," noting that "with support," Plaintiff would help her team "achieve the success they are full [sic] capable of achieving." Ex. 7.

15. Plaintiff's leadership and people management performance issues nevertheless continued following her 2023 Mid-Year Performance Evaluation. Conte Decl. ¶ 8. Ms. Conte therefore rated Plaintiff's overall performance in 2023 as "Inconsistent." Conte Decl. ¶ 8; Exs. 9 and 10.

16. Ms. Conte finalized Plaintiff's 2023 year-end performance rating of "Inconsistent" in approximately November 2023 after working closely on it with Terry Wilmore, Ms. Conte's

Human Resources Business Partner. Conte Decl. ¶ 8; Deposition Transcript of Terry Wilmore ("Wilmore Tr.") at 51:12-15 ("Shardenay was calibrated as inconsistent in the October-November time frame"), a true and correct excerpts of which are attached hereto as Exhibit D; Ex. 11. In addition, Ms. Conte also rated a male (non-pregnant) ME as "Inconsistent" for 2023. Conte Decl. ¶ 9.

17. In connection with Ms. Conte's decision to rate Plaintiff "Inconsistent" for her 2023 performance, Ms. Conte completed the template used for issuing the "Below Strong" performance ratings of "Inconsistent" and "Action Required." Ex. 12. Ms. Conte's decision to rate Plaintiff "Inconsistent" was also approved by Ms. Conte's supervisor and Ms. Wilmore's supervisor. Conte Decl. ¶ 8; Ex. 13; Ex. 14.

18. The same leadership and people-management issues Ms. Conte identified with Plaintiff's performance in 2022 persisted throughout 2023. Conte Decl. ¶ 10; Ex. 10. Ms. Conte's written evaluation states that Plaintiff:

> went all in on her process and analytical orientation and this prevented her from leading with a balanced head and heart. [Plaintiff] is very organized and intentional and yet perhaps missed the opportunity to put the "list down" and be more adaptive and find a balance between process and people.

Ex. 10. The written evaluation also notes that, while Plaintiff "owned the performance opportunities, there was not enough time to see a consistent outcome of those efforts to lead to a strong performance in 2023." *Id.*

19. During her deposition, Plaintiff admitted her AAS results were lower in 2023 than in 2022 and were below the Capital One average. Plaintiff Tr. 70:2-78:15. Plaintiff further admitted that her AAS Q3 2023 scores were lower than her Q1 and Q2 scores. Plaintiff Tr. 197:2-17; Ex. 8.

20. In connection with Ms. Conte's decision to rate Plaintiff "Inconsistent" for her 2023

performance and in conjunction with Ms. Wilmore, Ms. Conte prepared a Coaching Plan for Plaintiff. The Coaching Plan outlined Plaintiff's performance deficiencies in various leadership and people-management competencies, primarily with respect to Plaintiff's continued inability to effectively manage the employees she supervised to meet performance expectations. The Plan also laid out specific objectives to help Plaintiff to improve her performance with Ms. Conte's close and ongoing support and coaching. Conte Decl. ¶ 10; Ex. 15.

21. Ms. Conte was hopeful that Plaintiff's performance would improve. Ms. Conte planned to deliver Plaintiff's 2023 Year-End Performance Review and present the Coaching Plan to Plaintiff in February 2024, during Plaintiff's annual review. Because Ms. Conte was aware that Plaintiff would soon thereafter be going out on parental leave following the birth of her twins, Ms. Conte anticipated that she and Plaintiff would work together on the Coaching Plan after Plaintiff returned from leave. Ms. Conte expressed that hope at the end of Plaintiff's 2023 written evaluation, explaining that Plaintiff's skill at "choosing courage over comfort" would "serve her well" both as she moved from the Suffolk Market team to the Nassau Market team and with respect to "all the new and wonderful life events that are in store for [Plaintiff] in 2024," namely, the birth of her children. Conte Decl. ¶ 11; Ex. 10.

22. Ultimately, Ms. Conte had no opportunity to continue the planned work with Plaintiff to address her performance issues due to the termination of Plaintiff's employment on February 2, 2024. Conte Decl. ¶ 12; Wilmore Tr. 28:2-16.

**<u>Plaintiff's Pregnancy Disclosure, Accommodation Request, and Parental Leave Request</u>**

23. In October 2023, Plaintiff told Ms. Conte that she was pregnant with twins. Plaintiff Tr. 86:13-15, 88:2-89:7. Plaintiff testified that Ms. Conte congratulated her and asked Plaintiff if she planned to share the news more broadly, but Plaintiff does not recall anything else

about that conversation. Plaintiff Tr. 88:2-89:7.

24. On or about December 4, 2023, Plaintiff told Ms. Conte that she intended to take approximately 18 weeks' parental leave following the birth of her twins. Plaintiff does not recall anything Ms. Conte said in response. Plaintiff Tr. 91:6-93:7.

25. In December 2023, Plaintiff requested to work from home as a medical accommodation related to her pregnancy. Plaintiff Tr. 93:8-20, 140:11-23. Ms. Conte received an email from the Capital One Associate Care Team (CapitalOneAccommodations@sedgwick.com) informing her that Plaintiff submitted an accommodation request. Ex. 16. Plaintiff was working from home at the time she made the accommodation request based on her doctor's orders. Plaintiff Tr. 140:11-23. She was permitted to work from home after making the request, which was officially approved in January 2024. Plaintiff Tr. 93:8-20, 140:11-23, 141:7-142:5, 144:22-145:5. Plaintiff testified that her accommodation request was approved by Ms. Conte. Plaintiff Tr. 93:8-20, 144:22-145:5.

26. Plaintiff also testified at her deposition that no Capital One employee ever made a negative comment to her about her pregnancy or accommodation. Plaintiff Tr. 97:5-12.

**<u>January 13, 2024 Gas Leak at Roslyn Branch</u>**

27. As of January 2024, Plaintiff was the ME for the Nassau County market, including the Roslyn branch ("Roslyn Branch"). Plaintiff Tr. 47:21-25, 51:9-53:22. [redacted] was the Market Manager responsible for the Roslyn Branch. Conte Decl. ¶ 13; Plaintiff Tr. 98:7-11.

28. On the morning of Saturday, January 13, 2024, Capital One Branch Ambassadors [redacted], [redacted], and [redacted] encountered a strong gas smell when they entered the Roslyn Branch to open it for the day. Ex. 17; Ex. 18 at PALMER-00000275; Ex. 19.

29. Neither Plaintiff nor Mr. [redacted] was physically present at the Roslyn Branch that

day. Plaintiff testified that, at the time, she did not believe Mr. [redacted] was physically present at the branch. Plaintiff Tr. 110:15-17, 115:5-116:9; Deposition Transcript of Rosalinda Bradley ("Bradley Tr.")[4] at 137:9-138:13, a true and correct excerpts of which are attached hereto as Exhibit E.

30. At 8:44 a.m., Ms. [redacted] called Mr. [redacted] and explained that there was a strong gas smell at the branch. Mr. [redacted] told Ms. [redacted] to proceed with opening the branch at 9:00 a.m. and instructed that the front door be kept open for ventilation. Ex. 19.

31. By the time the branch opened to customers at 9:00 a.m., the Branch Ambassadors reported that the smell of gas was getting stronger and becoming unbearable, making them feel lightheaded. Ex. 18 at PALMER-00000275.

32. Concerned about the continued smell, Ms. [redacted] called 911 at approximately 9:05 a.m. In response, the Nassau County Fire Department arrived at the branch at approximately 9:09 a.m. and placed a large fan at the door. Exs. 17-19.

33. Around 9:09 a.m., Ms. [redacted] called Mr. [redacted] to inform him that they had called 911 and that the Fire Department was on scene. Mr. [redacted] asked Ms. [redacted] why they had called 911 without first speaking to him. Ms. [redacted] explained that they did so because the smell was strong and people were dizzy. Ex. 18 at PALMER-00000286-289.

34. At 9:14 a.m., Mr. [redacted] called Plaintiff to inform her that the Branch Ambassadors had reported a strong gas smell at the Roslyn Branch and had contacted local authorities. Plaintiff Tr. 114:25-116:16; Ex. 18 at PALMER-00000291; Ex. 20.

35. At 9:25 a.m., the Fire Department advised that it was not safe to remain in the

[4] Rosalinda Bradley's full name is Rosalinda Bradley Cassella. Ms. Bradley's deposition and other documents cited herein reflect that Ms. Bradley and others used "Bradley" and "Cassella" interchangeably as a surname for Ms. Bradley. For convenience and consistency, she is referred to as "Ms. Bradley" herein. *See* Bradley Tr. 13:12-14:24; Plaintiff Tr. 37:19-25.

building. Exs. 18 and 19.

36. At 9:28 a.m., Mr. [redacted] called Plaintiff again and told her that the Fire Department said it was not safe to be in the branch. Plaintiff asked him to contact the associates at the branch to get an update from the Fire Department about how long it would take to fix the issue. Mr. [redacted] then called Ms. [redacted] who said that the Fire Department did not know how long it would take, but that it did not matter and everyone needed to leave the building. Ex. 18 at PALMER-00000287-291; Ex. 19; Ex. 20; Plaintiff Tr. 118:4-119:19.

37. Plaintiff admitted that when she spoke to Mr. [redacted] at 9:28 a.m., she told him to have the team "start the closing procedures" at the Roslyn Branch, which Plaintiff testified can take approximately 10 to 15 minutes. Plaintiff Tr. 118:4-119:19, 121:10-13, 137:16-23. Plaintiff directed her team to carry out the closing procedures despite her knowledge that the Fire Department had already told them it was not safe to be in the Roslyn Branch. Ex. 17; Ex. 18 at PALMER-00000275, 285, 287, 294; Ex. 21. Closing procedures involve routine tasks such as counting money and securing the vault. Conte Decl. ¶ 14. Securing the vault can also be accomplished by the via remote monitoring. *Id.*

38. At 9:29 a.m., Plaintiff called Ms. Bradley, Regional Operations Director, to inform her that the branch would be closing due to a gas leak. Plaintiff Tr. 122:3-17; Bradley Tr. 114:10-115:7; Ex. 18 at PALMER-00000291; Ex. 19; Ex. 22.

39. Based on Plaintiff's call with Ms. Bradley, Ms. Bradley emailed Branch/Café Mission Control ("BCMC") at 9:33 a.m., stating the Roslyn Branch would be closed for the day "as the fire marshal have [sic] shared it's not safe for us to be in the building at this time." Plaintiff was copied on this email. Ex. 23; Bradley Tr. 141:1-143:7.

40. At 9:34 a.m., Plaintiff called Mr. [redacted] to confirm her earlier instruction to close

the Roslyn Branch. Plaintiff Tr. 126:15-23, 137:16-23; Ex. 18 at PALMER-00000291; Ex. 20.

41. As a result of Plaintiff's directive to complete closing procedures before leaving the branch, the Branch Ambassadors worked to complete those procedures including closing the vault. The Branch Ambassadors encountered difficulty manually closing the vault—which could have been secured via remote monitoring by Capital One security personnel—and, as a result, did not leave the branch until 10:14 a.m. Plaintiff Tr. 126:24-127:16; Ex. 17; Ex. 18 at PALMER-00000275, 287-290, 294.

42. At no time between 9:14 a.m. (when Plaintiff first learned of the gas leak incident) and 10:14 a.m. (when the Branch Ambassadors left the branch) did Plaintiff direct evacuation of the branch. Plaintiff Tr. 130:18-22.

43. From the time Plaintiff asserts she first told Mr. [redacted] to have the team start closing procedures (9:28 a.m.) to the time when the Branch Ambassadors exited the branch (10:14 a.m.), 46 minutes elapsed. *See supra* ¶¶ 37, 41. During that time, the Branch Ambassadors reported that they performed the closing procedures even though they were dizzy, felt the gas smell was getting to them and they "couldn't function," and/or felt extremely unsafe and that their lives were in danger. Ex. 18 at PALMER-00000288-289.

44. During that same time period, Plaintiff made or received a total of five phone calls in connection with the gas leak incident—four with Mr. [redacted] and one with Ms. Bradley—each of which lasted one minute or less. Exs. 20 and 22; Plaintiff Tr. 131:3-132:8, 133:12-24.

45. At no point did Plaintiff contact the Roslyn Branch itself, or any of the Branch Ambassadors, to check on their well-being or the status of the closure. Plaintiff Tr. 119:20-120:23, 138:6-12. Nor did Plaintiff follow up with Mr. [redacted] after she spoke to him at 9:34 a.m. Plaintiff admitted she was not aware until the following week (when she was interviewed about the

incident) of the time it took the associates to leave the branch because of the vault issue. Plaintiff Tr. 127:6-128:7. Between the January 13 incident and Plaintiff's January 18, 2024 interview as part of the Company's investigation into the incident, Plaintiff never asked anyone "what had happened." Instead, she testified, "[n]o one asked me about any of it." Plaintiff Tr. 127:14-128:7.

**Investigation of Gas Leak**

46. On January 16, 2024, Ms. [redacted] reached out to Associate Relations ("AR") with safety concerns about how the gas leak incident was handled. The Company's investigation notes reflect Ms. [redacted]' report:

> "Manager got mad at us for calling 911." Fire department showed up, sentry agent called, FD said the gas smell was unsafe for employees. Manager told associates they could not leave, and FD suggested evacuation. PD and FD on scene confirmed gas leak from restaurant next door. FD said I think you should close so we can contain gas leak. Leave building ASAP. Manager said "No you can't leave that is not how this works, you cannot leave, needs to contact Chardonnay, that they need to wait" even though they felt it was an emergency situation. Feels that they should have closed bank immediately. Felt forced to stay, manager said to do closing procedures even though being asked to leave by FD. Told manager this, he did not care and had no concerns for safety. Very unsafe, inhaling toxins and fumes and none of that was taken into consideration in a dangerous situation. Attempted to lock vault door, but the vault would not lock/stuck. Tried for 15 minutes. Sentry agent manually armed the vault, manager said they needed to call him before leaving. Manager said no no you cannot leave with vault door unlocked, and he kept saying try a key. Felt they really needed to get out of building. Manager was saying you cannot leave vault door unsecure. Associate had sentry agent on cell phone, felt light headed and was outside periodically. Sentry agent told manager the vault was armed and staff needed to leave. Everyone left around 10:15am. Parents were very upset, and said your manager should not have said you need to stay. Felt extremely unsafe and life was in danger. Called PD at 9:07am, by 10am they were still in the building.

Ex. 17; Ex. 18 at PALMER-00000275.

47. An investigation into the January 13, 2024 incident was led by AR Consultant Aimee Dunlow under AR Case No. 20240116-3859553. During the investigation, Plaintiff, Mr. [redacted], Ms. [redacted] Ms. [redacted] and Ms. [redacted] were interviewed. Ex. 18; Conte Decl. ¶ 13.

48. Ms. Dunlow interviewed Plaintiff on January 18, 2024. During the interview,

Plaintiff and Ms. Dunlow reviewed the Branch and Café Grab & Go Emergency Checklist. Ex. 18 at PALMER-00000291; Plaintiff Tr. 153:19-155:5.

49. The Branch and Café Grab & Go Emergency Procedures ("Emergency Procedures") and Branch and Café Grab & Go Emergency Checklist ("Emergency Checklist") in effect on January 13, 2024 provide direction to personnel on how to act in different emergency scenarios, but do not expressly address actions that need to be taken in case of a gas leak, including whether associates should forgo normal closing procedures. Exs. 24 and 25.

50. Plaintiff testified that she was familiar with the Emergency Checklist prior to the gas leak incident on January 13, 2024, because, when she was a ROM, she "would have worked on updating the policy and the document itself" and when she was performing branch inspections, it "was something we were required to check if the branch had in a binder." She explained, "I know I would have been looking at this policy as part of that work." Plaintiff Tr. 155:16-156:13. She also acknowledged that she "maintain[ed] an awareness of it" and was, herself, "a point of contact based on some of the steps depending on what has transpired." Plaintiff Tr. 156:14-160:12.

51. Plaintiff testified that the section of the Emergency Checklist relating to emergency evacuations applied to an "event where there had to be an emergency evacuation," and acknowledged that branch leadership, including MMs and MEs, could decide an emergency evacuation was required. Plaintiff Tr. 157:7-158:18. Plaintiff agreed that the policy did not list all of the things that would constitute an emergency and testified that, other than upon receiving direction to evacuate from law enforcement or in the event of an explosion in the branch, she was unable to think of any other example in which an ME could order an evacuation. Plaintiff Tr. 158:19-159:20.

52. Plaintiff testified that she also recognized the Emergency Procedures as "the actual

procedure that goes along with the [Emergency Checklist]" and was aware of the document because "[i]t would have been in Pinpoint," which is the "intranet system where the policies are housed." Plaintiff Tr. 160:17-161:6.

53. Plaintiff testified that the section of the Emergency Procedures governing emergency evacuations does not define "emergency," but that, depending on the scenario, an MM or ME would have discretion to decide whether there was an emergency that required an evacuation. Plaintiff Tr. 161:7-162:5.

54. While the Emergency Procedures and Checklist do not expressly cover every possible emergency event a branch could experience, they are intended and expected to be used by Company employees, including with respect to the Roslyn Branch, as guidance to follow when exercising judgment in different scenarios that may occur. Bradley Tr. 59:10-62:5, 63:10-72:22. Ms. Bradley testified that, when faced with an emergency situation, employees are supposed to use their judgment, along with guidance provided or available to them, to decide what to do. Bradley Tr. 67:6-19. That guidance includes both the Emergency Procedures and Emergency Checklist. Bradley Tr. 67:6-19.

55. On January 29, 2024, Ms. Conte participated in a meeting with Ms. Dunlow, Ms. Wilmore, and other AR team members concerning the findings of the AR team's investigation of the gas leak incident at the Roslyn Branch and Plaintiff's involvement with it. Ms. Dunlow informed Ms. Conte that when Plaintiff learned the Fire Department had indicated that it was not safe for anyone to be in the branch, Plaintiff instructed the associates to follow closing procedures rather than evacuate the building. Ms. Dunlow also shared that Plaintiff appeared more concerned about how long it would take to fix the gas leak than about the safety of the associates at the branch. Conte Decl. ¶ 13.

56. During the January 29, 2024 meeting, Ms. Dunlow also told Ms. Conte that their investigation found that Mr. [redacted] had disregarded concerns raised by associates at the Roslyn Branch from the time they first reported the gas leak to him. Conte Decl. ¶ 13. Ms. Dunlow concluded that Mr. [redacted] should have instructed the employees to call 911 and should have consulted Pinpoint for guidance on emergency procedures. Conte Decl. ¶ 13. Instead, Ms. Conte learned that Mr. [redacted] directed the employees to open the branch despite the toxic fumes. Conte Decl. ¶ 15.

57. Based on the information presented and discussed at the January 29, 2024 meeting, Ms. Conte, Ms. Wilmore, and the AR team collectively agreed to terminate Plaintiff's and Mr. [redacted]s employment due to their mishandling of the January 13, 2024 gas leak incident. Conte Decl. ¶ 17.

58. Ms. Bradley testified that she agreed with the decision to terminate Plaintiff's employment because "the fire department ask[ed] for our associates to evacuate" and Plaintiff was "a leader of the bank that chose not to follow that decision and put our associates at risk and having them stay at a location that could possibly, due to gas, explode." Bradley Tr. 152:10-153:6.

59. Ms. Wilmore testified that she believed Plaintiff violated "the emergency evacuation Pinpoint article" by her "[f]ailure to exit the building when emergency personnel advised that it was not safe for associates to be in the location." Wilmore Tr. 35:5-19, 38:11-39:7. Ms. Wilmore further testified that the reason for Plaintiff's termination was that "she failed to keep our associates safe and violated our code of conduct and emergency procedures when emergency personnel said it is not safe to be in a location." Wilmore Tr. 42:22-43:7, 46:5-47:4, 72:3-73:1.

60. Ms. Conte believed that Plaintiff had—and knew or should have known that she had—the unilateral discretion and authority to order the immediate evacuation of the Roslyn

Branch upon learning that there was any risk of harm to human life. With respect to the gas leak incident on January 13, 2024, Ms. Conte believed that Plaintiff failed to appropriately exercise that discretion and authority, and her decision unquestionably put Capital One employees and others at risk. Her decision that Plaintiff's employment should be terminated was based solely on the poor judgment Plaintiff displayed in connection with this incident. Conte Decl. ¶ 15; Wilmore Tr. 57:13-19.

61. Plaintiff and Mr. [redacted] were terminated on February 2, 2024. Conte Decl. ¶¶ 16-17. Plaintiff was informed by Ms. Conte during her termination meeting that she was being terminated because of her mishandling of the January 13, 2024 gas leak incident and failure to meet performance expectations on that day. Ex. 18 at PALMER-00000280. Ms. Wilmore was present with Ms. Conte during Plaintiff's termination meeting. Conte Decl. ¶ 16.

62. Specifically, Plaintiff was told that, as a leader, her decisions during the incident put associates, customers, and Capital One's reputation at high risk. Ex. 18 at PALMER-00000280. The termination script, which Ms. Conte read verbatim during Plaintiff's termination meeting, stated that Plaintiff was expected not only to follow procedures for emergency scenarios, but also to exercise proper judgment and discretion to ensure the safety and security of associates, customers, and company assets. Conte Decl. ¶ 19; Ex. 26. Plaintiff was told that, on multiple occasions, she failed to follow the Emergency Evacuation Pinpoint procedures and disregarded directions from emergency personnel. Ex. 26. Mr. [redacted] was terminated for the same reasons. Conte Decl. ¶ 20.

63. Plaintiff was also informed that she received a 2023 YE "Inconsistent" rating and that she would be provided a copy of her 2023 YE review by email. Following the termination meeting, Ms. Conte emailed Plaintiff a copy of her 2023 YE evaluation. Conte Decl. ¶ 19; Ex. 26;

Wilmore Tr. 65:6-21.

64. Ms. Conte's supervisor, Jennifer Windbeck, summarized the basis for the decision to terminate Plaintiff and Mr. [redacted]:

> AR determined that this branch Market Manager, along with his Market Executive, demonstrated extremely poor judgement [sic] and excessive risk-taking in requiring branch associates to remain in a branch with a noticeable gas smell for an extended period of time, rather than advising them to evacuate immediately. These poor decisions put the associates in immediate danger of an explosion or fire, as well as health implications from inhaling the gas. While we're all sympathetic to both of these managers, and assume positive intent, AR felt that their poor decision-making warranted termination, and we agree.

Ex. 27.

**<u>Plaintiff's Post-Termination Complaints and Testimony</u>**

65. After her termination meeting on February 2, 2024, at approximately 2:38 p.m., Plaintiff contacted AR to raise concerns about her termination, stating that she believed it was unfair. On February 7, 2024, Plaintiff submitted a Termination Dispute Request Consultation Form disputing various aspects of her termination. Plaintiff did not express any concern that her termination was the result of discrimination on the basis of her pregnancy, her pregnancy-related work-from-home accommodation, or her planned maternity leave. On February 21, 2024, Plaintiff was informed that, after a thorough review, the termination decision was upheld. Ex. 28.

66. On March 15, 2024, Plaintiff submitted another complaint to AR related to her termination, which was investigated by Lynsey Langworthy under AR Case No. 20240315-3936845. For the first time, Plaintiff asserted that her termination was motivated by discrimination on the basis of her pregnancy, request for a pregnancy-related accommodation, and request for parental leave. Ms. Langworthy interviewed Ms. Conte and Ms. Wilmore as part of her investigation into Plaintiff's pregnancy discrimination allegations. Both stated that Plaintiff's pregnancy, accommodation request, and disclosure of intended parental leave played no role in

decision-making related to Plaintiff's termination or her 2023 YE inconsistent rating. Langworthy closed her investigation with a finding of no policy violation. Ex. 29.

67. Plaintiff's pregnancy and pregnancy-related work-from-home accommodation played no role in the decision to terminate Plaintiff's employment. Conte Decl. ¶ 21; Wilmore Tr. 69:11-70:10.

68. Plaintiff testified that the only evidence she has to support her contention that her termination was the product of discrimination by Ms. Conte and the Company is that her decisions on January 13, 2024 were "made in concert and with approval from" Ms. Bradley, yet Ms. Bradley was not terminated "for the same decision." Plaintiff Tr. 97:13-101:4. Nevertheless, Plaintiff admitted that Mr. [redacted], a non-pregnant male, was also terminated in connection with the same incident. Plaintiff Tr. 98:7-16. As Ms. Bradley testified, the decision to close a branch is one about which Plaintiff did not "have to confer with me. She's the market executive and it's a market executive's decision to be able to close." Bradley Tr. 92:8-93:14, 105:1-19 ("I don't own the branches, right? The branches are owned by the market executive and the regional executive. So as I had shared before, I'm a consultant, so the decisioning to open or close a location is theirs. I can provide my perspective . . . [b]ut that is their decision.").

69. Aside from the events of January 13, 2024, Plaintiff was asked during her deposition what other evidence she had to support her contention that she was discriminated against on the basis of her pregnancy. She testified, "I don't believe that, again, based on the incident that happened, I don't believe that I did not follow policy as they contend. I don't believe that I made an error." Plaintiff Tr. 99:9-16.

70. Plaintiff testified that natural gas can be dangerous and that, when there is a gas leak, there "could be a fire hazard" because "it's flammable" and can cause an explosion. Plaintiff

Tr. 102:20-103:9. She acknowledged that she knew that natural gas could cause an explosion not because she is an expert, but because she is an adult human and it is common knowledge. Plaintiff Tr. 106:4-23. She also admitted that natural gas can make humans physically ill, including by causing nausea and headaches. Plaintiff Tr. 103:13-20.

71. Plaintiff was asked what she would do if she smelled natural gas in the room in which Plaintiff's deposition was occurring. She testified, "I guess I would wait for the building to say what comes next." Asked if she would be comfortable waiting for an hour, Plaintiff testified that she could not say "specific to an hour." Plaintiff was asked if she would be comfortable sitting in a closed room that smells like natural gas for an hour, to which she responded, "[i]f the room is closed, I would probably want to ventilate and find out what's going on." Plaintiff Tr. 107:25-108:21.

72. Plaintiff was asked what she would tell someone in her family if they called from home and said the house smells like natural gas. Plaintiff testified that she would tell them to "[c]heck the stove and open windows. If it doesn't go away, I would tell them to contact the authorities," specifically the fire department, "to see whether there was a bigger issue." Plaintiff was then asked if she would "tell them to leave the house." Plaintiff testified that "it would depend on how—did the smell go away, is it strong, is it not. There's a lot of variables." Plaintiff Tr. 108:22-110:2.

73. Plaintiff admitted that when she spoke to Mr. [redacted] on January 13, 2024 regarding the gas leak incident, she did not ask him about the length of the smell or the strength of the smell. Plaintiff Tr. 164:11-165:5.

74. When Plaintiff was asked whether she would tell her family to leave the house if "it was a strong smell that didn't go away," she responded, "I don't know." Plaintiff Tr. 108:22-

110:14.

75. Plaintiff testified that, with respect to the January 13, 2024 gas leak incident, she "was not made aware of an evacuation order from the fire department." She testified that, in her view, "saying it's not safe to be in the building is different from an evacuation order." Plaintiff was asked, "if the fire department came to your house and told you it's not safe to be in your house, what would you do?" Plaintiff testified that, "[i]f the fire department came to my home and told me that it wasn't safe to be inside, I would leave the home." Plaintiff Tr. 165:11-167:12.

76. Plaintiff was asked if she thought she "made any mistakes on January 13, 2024." She testified, "I look back, and I would have to say I would do the same thing." Plaintiff Tr. 174:12-15. She was asked "[i]f the same thing that happened on January 13th happened at one of your branches now [at her new employer], would you do anything different?" Plaintiff testified, "I don't believe I would have done anything different to what I did that day." Plaintiff Tr. 138:25-139:6.

Dated: New York, New York
October 5, 2026

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: *Gina F. McGuire*

Gina F. McGuire, Bar No. 5103916
gina.mcguire@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
+1.212.309.6000
+1.212.309.6001

*Counsel for Defendant Capital One N.A.*